In The

*Court of Appeals*

*Ninth District of Texas at Beaumont*

_____

**NO. 09-23-00119-CR**
_____

**TERRY EDWARD KEYLON JR., Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 435th District Court**
**Montgomery County, Texas**
**Trial Cause No. 21-07-10585-CR**

**MEMORANDUM OPINION**

A jury found Terry Edward Keylon Jr. ("Keylon") guilty of the third-degree felony offense of assault family violence with a prior conviction for assault family violence strangulation. *See* Tex. Penal Code Ann. § 22.01(a), (b)(2)(A). Keylon also pleaded "true" to two felony enhancements, making him eligible for punishment as a habitual offender. *See id.* § 12.42(d) (outlining enhanced punishment range for habitual offenders). The jury found the enhancement paragraphs true, assessed punishment at fifty years of confinement, and the trial court sentenced him

1

accordingly. Keylon challenges the trial court's judgment, and in three issues, he complains of certain evidentiary rulings and the sufficiency of the evidence to support his conviction. We affirm the trial court's judgment for the reasons discussed below.

## I. BACKGROUND AND TRIAL EVIDENCE

Keylon and "Lisa" were in a dating relationship and lived together on his grandmother's property in Montgomery County.[1] They were involved in a domestic dispute that began on July 25, 2021, which continued into the early morning hours of July 26, 2021. Shortly after the dispute, Lisa drove to a gas station where she encountered two sheriff's deputies, told them Keylon assaulted her, and showed them her injuries, and they began investigating. A Montgomery County Grand Jury indicted Keylon, and the indictment alleged that Keylon

> on or about July 26, 2021, . . . did then and there intentionally, knowingly or recklessly cause bodily injury to [Lisa], [] a person with whom the defendant has or has had a dating relationship, . . . by grabbing/squeezing/pushing with defendant's hand,
>
> And it is further presented . . . that before the commission of the offense alleged above, on April 11, 2016, in Cause Number 27436 in the 12th District Court of Walker County, Texas, the defendant was convicted of the offense of Assault Family Violence Strangulation, an offense under Chapter 19, Chapter 22, Section 20.03, Section 20.04, Section 21.11, or Section 25.11 of the Penal Code, against a person whose

---

[1]We refer to the victim by a pseudonym to conceal her identity. *See* Tex. Const. art. I, § 30 (granting crime victims "the right to be treated with fairness and with respect for the victim's dignity and privacy throughout the criminal justice process[ ]").

> relationship to or association with the defendant is described by Section 71.003, 71.005 or 71.0021(b) of the Family Code[.]

Keylon stipulated to the April 11, 2016, assault family violence conviction. With this background in mind, we turn to the evidence adduced at trial.

## A. Lisa's Testimony

Lisa testified that on July 25 and 26, 2021, she and Keylon were in a dating relationship and had been since October 2020. She testified that their relationship was getting serious, and when this happened, she described him as her fiancé. In July 2021, they lived together in his "grandparents' old house" in Montgomery County.

Lisa testified that late on the night of July 25, and into July 26, 2021, she and Keylon had a fight. She explained it began after a night of drinking when Keylon received a text message from a family member. Lisa testified they both drank heavily that evening and were intoxicated. She estimated she drank a twelve-pack of beer. She explained that he became more agitated when she decided it was time for bed and wanted to stop drinking, but he wanted to continue drinking and drive around the property on the side-by-side.

When Lisa did not want to ride around with him, they started arguing, and "it just got physical." She testified that Keylon put his hands on her first. She described him grabbing her with both hands by her upper arms, squeezing, and pushing her against the kitchen counter. She testified it did not hurt immediately when he squeezed her arms but did later. She testified that they "were still yelling at each

3

other, and he was just shaking me up against the counter and the cabinets[,]" and did so "[v]iolently." When he did this, he caused her to hit her hip and back on the countertops. During the altercation, Keylon also grabbed her tightly by the hair behind her ears and was "[v]iolently" "slamming" her head against the cabinets, so she reacted by grabbing his beard. She said that when he grabbed her hair it caused her pain and ripped out some of her hair.

Lisa testified that "it was really physical," and she "was scared." She wanted him to let her go, and although it lasted minutes, "it seemed like forever." She described her attempts to get away from him, and he eventually let her go. Lisa testified she immediately grabbed her things and drove to a nearby gas station. About twenty or thirty minutes after the assault, she approached some police officers she encountered at the gas station. Lisa testified she asked them for help, because she wanted her things out of the house and "didn't know where else to go." When she met the police officers, she was crying, "scared, nervous[,]" and still in pain.

The officers began investigating and asked her what happened, collected evidence, took photographs, then went to the residence to try to talk to Keylon. During Lisa's testimony, photographs of her injuries were admitted into evidence. Lisa testified that when the officers photographed her, she was still in pain and graded her pain as a level six out of ten. Lisa testified the photographs showed the injuries caused by Keylon during the assault, including a mark on her cheek, missing

4

hair, a bite mark on her knuckle, and a swollen lip, among others. She also took photographs of her injuries which were admitted into evidence showing her swollen lip and redness around her shoulders and back. Lisa testified that she told prosecutors and defense counsel that on July 26, 2021, Keylon assaulted her in Montgomery County, Texas.

On cross-examination, Lisa testified that she was diabetic and could have experienced a diabetic episode when this happened in addition to being intoxicated. She also admitted that she did not remember most of the evening but remembered "pieces" and explained there were some things that she remembered after watching a video from that night. Lisa testified that she did not remember falling that night, but she could have, but if she did it was because of him. She also testified she owns and works with horses. Nevertheless, she denied that her level of intoxication, diabetes, or a horse caused the injuries shown in the photographs.

## B. Joshua Wright's Testimony

Deputy Joshua Wright ("Wright") with the Montgomery County Sheriff's Office also testified. He described his training relating to family violence and testified he has investigated about one hundred family violence cases while working as a sheriff's deputy. Wright testified that in his experience, family violence victims can be vulnerable and reluctant because of the relationship with their alleged abuser.

Wright testified that in the early morning hours of July 26, 2021, he was patrolling near New Waverly, which is partially located within Montgomery County. He stopped at a gas station to get coffee a little before 2 a.m. Two other officers assisted with this investigation, but Wright was the primary investigating officer. As he tried to enter the gas station, Lisa approached him. Wright testified that when she approached, she "had obviously been crying, and she seemed, I guess, distraught. She seemed very confused and possibly a little scared." She then asked him a question about a protective order, which raised his suspicions. Wright explained he was concerned that there may have been a recent family violence incident that she was asking about. After Lisa approached him, he began investigating.

Wright noticed injuries on her body, including swollen and possibly busted lips, red puffy cheeks, and blood on her shirt. During the initial contact, there were no other injuries apparent, but after he interviewed her, she showed Wright multiple injuries. Although he did not identify the person who caused her injuries while he was at the gas station, Wright later identified Keylon as that individual.

During his investigation, Wright interviewed Lisa and verified the address of the assault, which is in Montgomery County. Once he learned the incident occurred within Montgomery County and his patrol jurisdiction, he asked Lisa to describe that night's events. She still seemed "shaken" and "scared," so he asked if she wanted to sit in her vehicle, which is where he began his interview. Lisa told Wright that

6

Keylon was her fiancé, they lived together at the described location, had been drinking alcohol, and were involved in a fight. Wright also had someone photograph Lisa's injuries, collected all the information he could about Keylon and the area he was going to, then informed Lisa he was going to the residence to speak with Keylon. Before he left the gas station, Lisa admitted having a few drinks and seemed confused, but when she approached, he did not immediately know she was intoxicated. Wright testified that although Lisa admitted being intoxicated, he did not perform a DWI investigation. He also agreed that intoxicated individuals can be irritable, agitated, belligerent, stumble, fall, and wreck their vehicles. Wright said that when he left, she had the ability to drive and was free to go.

Wright testified that family violence calls are "[v]ery dangerous" and explained why. He said the likelihood of a use of force or shooting is higher on these cases when the deputies arrive to further investigate. When he arrived at the house, it was consistent with Lisa's description. He noted a back porch leading to a sliding glass door that Lisa described, which is where he tried to contact Keylon. He also observed a refrigerator that seemed out of place and consistent with what Lisa mentioned at the gas station.

Wright drove his patrol car and was in uniform when he approached the house. Wright testified that he announced himself as an officer, which included him knocking loudly, saying "sheriff's office," and turning the flashlight on himself so

7

anyone could see his uniform. While at the glass door, Wright saw Keylon inside. Wright explained that Keylon did not come to the door immediately, it took several minutes, several loud knocks, and announcing his presence several times. He described Keylon as "naked" and "very . . . agitated or angry that either I was there or that I had woken him up." Wright testified that it caught his attention that Keylon was angry, there were "some hand gestures" and a "slurred voice[,]" which made Wright believe Keylon might be intoxicated. He asked to talk with Keylon several times. Wright said that Keylon eventually responded and told him, "[T]o get the f-ck off his porch."

Wright testified that he drove through an open gate onto the property without a warrant and began banging on a glass door announcing himself at 3 a.m. He agreed that might annoy someone, although Lisa consented to him going to the property to investigate. Upon cross-examination, Wright testified that Keylon was likely sleeping in the nude, and eventually tells him to get the "F" off his porch. At that point, Wright left, because Keylon exercised his right not to talk and had no duty to do so. Although Wright announced himself, he did not have the opportunity to tell Keylon why he was there. Wright exercised his discretion and left the property when Keylon told him to leave, but he had already established probable cause that Keylon committed a family violence offense. He testified that he could have entered the

8

home that night and arrested Keylon but later applied for a warrant to arrest Keylon on an assault family violence charge.

## C. Keylon's Testimony

Keylon also testified at trial. He testified that around 2015, he went to prison after he pleaded guilty to felony charges arising from a single incident, which included strangulation and assault on a public servant. In 2018, he pleaded no contest to another felony charge of assault family violence and went to prison. After being released from prison, Keylon moved to New Waverly and worked as a ranch hand on his grandmother's farm. He then started a business with Lisa, primarily building fences and decks. In October 2020, Lisa began living with him, and they lived in his great-grandmother's old house. When this happened, they were in a dating relationship, and at the time of trial they were still together and were still engaged.

Keylon testified that in July 2021, they drank every day and drank excessively. On July 25, 2021, he and Lisa worked on a fence. After they finished working, they bought alcohol and went home. When they arrived home, they "got stuff for the grill," and Keylon rode their horse around the property but could not recall if Lisa rode the horse. He explained that they were intoxicated, and he probably drank "a six-pack and a couple of 24-ounce Twisted teas[,]" but "Lisa normally drank twelve to eighteen beers." Keylon recalled that Lisa had fallen that night; his friend, Mr.

Bilnoski, was there and saw her fall at least once. Keylon also testified that he saw her fall three times that day.

Keylon explained that he "said something stupid[,]" and Lisa got angry and planned to leave. Keylon said Lisa then tripped over their large dog and fell. He claimed he picked her up and moved her to the counter by the sink, but she "went into full, defense mode." Keylon testified that "[s]he grabbed my beard, kicked me in the testicles, and the whole time, I was just trying to hold her because she's flailing." After that, he told her to leave.

Keylon testified that he did not see any injuries on her at the time, but it happened quickly. He believed Lisa sustained the injuries shown in the photographs accidentally and offered various potential explanations, including from multiple falls, working, horseback riding, being sunburned, and her being clumsy or reckless. He did not recall everything that happened that night but remembered the gist of it. He also said he went to bed, but she came in the room, and they continued arguing. He characterized Lisa as "confused" that night and testified she told him she did not remember what happened.

Keylon also testified that it was very rude for him to act the way he did toward the officers that night. Keylon testified without objection that he told police, "Get the f-ck out of here[]" when they came to his house.

10

**D. Richard Todd Bilnoski's Testimony**

Richard Todd Bilnoski ("Bilnoski") testified for the defense and is a friend of Keylon and Lisa's. Bilnoski said that on July 25, 2021, he was at their house from about 6:30 p.m. until 8:30 p.m. He testified Keylon and Lisa were going to ride horses and barbecue. He said, "Everything was normal." Bilnoski had seen Lisa fall many times, but that day, he saw her fall twice, although he did not see any injuries on her. He specifically denied seeing the injuries on Lisa shown in the photographs. Bilnoski testified he had never seen Keylon assault Lisa.

**E. Additional Defense Witness Testimony**

Two additional defense witnesses testified about Lisa falling on separate occasions but did not testify about the incident. Ugene Kernan ("Kernan") testified that Keylon and Lisa are helping remodel his home. He met them after July 25, 2021, and had no information to provide about the assault. Nevertheless, Kernan recalled seeing Lisa fall once, and described her hands as "beat up pretty bad from hitting the ground, one was swelling."

Aaron Fuller ("Fuller") is a contractor who had known Keylon and Lisa since before the incident. Fuller never observed Keylon intoxicated before, but had seen Lisa intoxicated enough that she fell on his wife's puppy, which he described for the jury.

11

## F. Other Evidence

Additional evidence admitted at trial included maps of the home Lisa and Keylon lived in, photographs of Lisa's injuries, and Keylon's stipulation to the April 11, 2016, assault family violence strangulation conviction, among other things. The State also read Keylon's stipulation to the prior assault family violence conviction to the jury.

## G. Evidentiary Objection

Before voir dire, the parties discussed a video that captures Keylon telling officers who arrive at his residence to investigate, "F-ck off." Keylon asserted that the video of Keylon saying that is irrelevant, not probative and "highly prejudicial." The trial court instructed the State not to mention it during voir dire and told Keylon, "When the time comes, object to it, approach." The trial court also told the parties that before any testimony, under Rule 403, it would perform a balancing test for probative value.

Keylon did not object during Wright's testimony that Keylon answered the door naked. When the State asked Wright how Keylon responded to his request to talk to him, Keylon objected and asked to approach the bench. Keylon asserted that: (1) the State was "backdooring" the fact that Keylon exercised his Fifth Amendment right; (2) it was very prejudicial and had no probative value; and (3) was irrelevant to whether an assault happened that night. The State responded that had Keylon

12

simply declined to be interviewed, the State would not comment on it; instead, Keylon chose to tell uniformed deputies standing at his door "to get the f-ck off his property." The State asserted it was an admission by a party opponent, it was more probative than prejudicial since Keylon "chose the words to be confrontational when they were attempting to further their investigation." The State also noted that Keylon was not under arrest at the time. The trial court allowed the question and testimony.

## II. ISSUES ONE AND TWO: ADMISSION OF EVIDENCE

In issues one and two, Keylon complains that the trial court erred by admitting testimony from Deputy Wright that Keylon answered the door naked and told him to "get the f-ck off his porch" the night of the incident because it was irrelevant, and any probative value was substantially outweighed by its prejudicial impact. He also contends that the erroneous admission of this testimony harmed him.

### A. Standard of Review

We review a trial court's decision to admit or exclude evidence for an abuse of discretion and must uphold the trial court's ruling if it was "within the zone of reasonable disagreement." *Wells v. State*, 611 S.W.3d 396, 427 (Tex. Crim. App. 2020) (citation omitted). A trial court abuses its discretion if it acts without reference to any guiding rules and principles or acts arbitrarily or unreasonably. *Rhomer v. State*, 569 S.W.3d 664, 669 (Tex. Crim. App. 2019). We uphold the trial court's decision if correct on any legal theory applicable to the case. *De La Paz v. State*, 279

S.W.3d 336, 344 (Tex. Crim. App. 2009); *Osbourn v. State*, 92 S.W.3d 531, 538 (Tex. Crim. App. 2002). If the trial court erred in admitting or excluding evidence, then we generally apply the harm standard in Texas Rule of Appellate Procedure 44.2(b), which requires us to disregard errors that do not affect substantial rights. *See* Tex. R. App. P. 44.2(b); *see also Walters v. State*, 247 S.W.3d 204, 218–19 (Tex. Crim. App. 2007) (citation omitted).

**B. Analysis**

Error preservation is a systemic requirement and must be reviewed by an appellate court, even when the issue is not raised by the parties. *Bekendam v. State*, 441 S.W.3d 295, 299 (Tex. Crim. App. 2014). Texas Rule of Appellate Procedure 33.1 governs error preservation. *See* Tex. R. App. P. 33.1. A party cannot present a complaint for appellate review unless the record shows that the party timely objected or made a motion stating the grounds for the requested ruling, unless the grounds were apparent from the context. *Id.* 33.1(a)(1)(A); *see Null v. State*, 690 S.W.3d 305, 318 (Tex. Crim. App. 2024). A party must also obtain a ruling from the trial court or object to the trial court's refusal to rule on the objection. Tex. R. App. P. 33.1(a)(2); *Null*, 690 S.W.3d at 318. Requiring a timely, specific objection serves two purposes: (1) it informs the judge of the basis of the objection and gives him a chance to rule; and (2) it provides opposing counsel an opportunity to respond to the

complaint. *Null*, 690 S.W.3d at 318; *Williams v. State*, 662 S.W.3d 452, 460 (Tex. Crim. App. 2021) (citation omitted).

Generally, a party must continue to object each time inadmissible evidence is offered. *See Martinez v. State*, 98 S.W.3d 189, 193 (Tex. Crim. App. 2003) (quoting *Ethington v. State*, 819 S.W.2d 854, 858 (Tex. Crim. App. 1991)); *see also* Tex. R. App. P. 33.1. The exception to this is when a party obtains a running objection, or the court hears the objection outside the jury's presence. *See Martinez*, 98 S.W.3d at 193. Error in the admission of evidence is cured where the same evidence comes in elsewhere without objection. *Lane v. State*, 151 S.W.3d 188, 193 (Tex. Crim. App. 2004) (quoting *Valle v. State*, 109 S.W.3d 500, 509 (Tex. Crim. App. 2003)); *see also Leday v. State*, 983 S.W.2d 713, 718 (Tex. Crim. App. 1998) (explaining that objection to evidence will not result in reversal when the same evidence was received without an objection, either before or after the complained-of ruling).

Keylon failed to timely object to Wright's testimony that he answered the door naked. *See* Tex. R. App. P. 33.1(a)(1)(A). Rather, the following exchange occurred:

> [THE STATE]. And how would you describe Mr. Keylon's appearance in the early morning hours of July 26th of 2021?
>
> [WRIGHT]. Mr. Keylon was naked and was very, I would say, agitated or angry that either I was there or that I had woken him up.

The record shows the State asked Wright six more questions before Keylon objected. He only objected and asked to approach the bench when the State asked Wright what

15

he said when he answered the door. Since Keylon failed to timely object to Wright's testimony that he answered the door naked, he has failed to preserve his complaint to that testimony. *See id.*; *Null*, 690 S.W.3d at 318.

Keylon timely objected to Wright's testimony that Keylon told him to "get the f-ck off his porch[,]" and the trial court conducted a hearing outside the jury's presence regarding Wright's testimony before ruling it was admissible. Yet Keylon himself later offered substantially similar testimony without objection during cross-examination. Keylon testified he was rude to the officer who came to his house and that he told him, "Get the f-ck out of here." Thus, any error in the complained-of ruling regarding Wright's testimony about how Keylon responded to him when he arrived at Keylon's home that night was cured when Keylon testified to the same without objection. *See Lane*, 151 S.W.3d at 193; *Leday*, 983 S.W.2d at 718. We overrule issues one and two.

## III. ISSUE THREE: SUFFICIENCY OF THE EVIDENCE

In his third issue, Keylon complains that the evidence was legally insufficient to support his conviction.

### A. Standard of Review

In evaluating legal sufficiency of the evidence to prove the charged offense, we review all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime

beyond a reasonable doubt. *See Jackson v. Virginia*, 443 U.S. 307, 318–19 (1979); *Hooper v. State*, 214 S.W.3d 9, 13 (Tex. Crim. App. 2007); *see also Metcalf v. State*, 597 S.W.3d 847, 855 (Tex. Crim. App. 2020). Under the *Jackson* standard, we defer to the jury's responsibility to fairly resolve conflicting testimony, weigh the evidence, and draw reasonable inferences from basic facts to ultimate facts. *See Hooper*, 214 S.W.3d at 13. The jury as factfinder is the sole judge of the weight of the evidence and witnesses' credibility, and it may believe all, some, or none of the testimony presented by the parties. *Metcalf*, 597 S.W.3d at 855 (citations omitted). We do not reweigh the evidence or determine the credibility of the evidence, nor do we substitute our judgment for that of the factfinder. *See Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). "Each fact need not point directly and independently to a defendant's guilt, as long as the cumulative force of all the incriminating circumstances is sufficient to support the conviction." *Balderas v. State*, 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (citation omitted).

**B. Analysis**

Keylon was charged with assault family violence with a prior assault family violence conviction, which elevated the offense from a Class A misdemeanor to a third-degree felony. *See* Tex. Penal Code Ann. § 22.01(a), (b)(2)(A). As alleged in the indictment, and under the applicable statute, the State had to prove that: (1) Keylon intentionally, knowingly, or recklessly caused bodily injury to Lisa; (2) he

17

and Lisa were in a dating relationship as defined by Texas Family Code section 71.0021(b); and (3) he had a prior qualifying assault family violence conviction dated April 11, 2016. *See id.*; *see also* Tex. Fam. Code Ann. § 71.0021(b) (defining dating relationship). The record shows that Keylon stipulated to the prior assault family violence conviction.[2] Therefore, at issue is whether the evidence is sufficient to support that he intentionally, knowingly, or recklessly caused bodily injury to Lisa and that they were in a dating relationship.

Both Keylon and Lisa testified that they were in a dating relationship and living together when this incident occurred. *See* Tex. Fam. Code Ann. § 71.0021(b). Keylon argues that the evidence is insufficient to show that he caused Lisa bodily injury. "Bodily injury" is defined as "physical pain, illness, or any impairment of physical condition." *See* Tex. Penal Code Ann. § 1.07(a)(8). Other courts have concluded the State proved bodily injury where a victim complained of pain, had "fresh scratch marks[,]" or had bruising. *See Settlemyre v. State*, 489 S.W.3d 607, 609 (Tex. App.—Eastland 2016, pet. ref'd); *Nunez v. State*, 117 S.W.3d 309, 323

---

[2]Stipulations "have the effect of withdrawing a fact from issue and dispensing wholly with the need for proof of the fact." *Bryant v. State*, 187 S.W.3d 397, 400 (Tex. Crim. App. 2005) (citation omitted). Therefore, a defense stipulation is a sufficient means of proving a prior conviction. *Henry v. State*, 509 S.W.3d 915, 919 (Tex. Crim. App. 2016); *Flowers v. State*, 220 S.W.3d 919, 921–22 (Tex. Crim. App. 2007).

(Tex. App.—Corpus Christi 2003, no pet.) ("Bruising is evidence of physical pain sufficient to show 'bodily injury.'").

Lisa testified that Keylon grabbed her by the arms and shoved her into cabinets, which caused her to hit her back and hip. She also described Keylon grabbing her tightly by the hair behind her ears and "[v]iolently" "slamming" her head against the cabinets. She said that when he grabbed her hair, it caused her pain and ripped out some of her hair. She testified that when she spoke to officers shortly after the incident, her pain was a six out of ten. Photographs of her injuries were also admitted at trial, showing a busted lip, a bite mark on her finger, missing hair, and red marks on her body. Lisa and other witnesses consistently testified that she was drunk when the assault occurred. Additionally, Keylon offered contradictory explanations for Lisa's injuries including falling, working, or horseback riding. He also testified that he simply helped her up after she fell.

The jury, as the sole trier of fact, was free to weigh the witnesses' credibility and resolve conflicts in the evidence and to believe Lisa's version of events over Keylon's. *See Williams*, 235 S.W.3d at 750; *Hooper*, 214 S.W.3d at 13. The evidence showed that Lisa suffered pain, sustained a swollen lip, redness, and a bite mark when Keylon assaulted her, which satisfies the "bodily injury" element. *See Settlemyre*, 489 S.W.3d at 609; *Nunez*, 117 S.W.3d at 323. Based on the evidence, a rational trier of fact could conclude beyond a reasonable doubt that Keylon

19

knowingly, intentionally, or recklessly caused Lisa bodily injury, and they were in a dating relationship. *See* Tex. Penal Code Ann. §§ 1.07(a)(8), 22.01(a), (b)(2)(A). Thus, the evidence was legally sufficient to support Keylon's conviction. *See Jackson*, 443 U.S. 307, 318–19; *Metcalf*, 597 S.W.3d at 855; *Hooper*, 214 S.W.3d at 13. We overrule issue three.

## IV. CONCLUSION

Having overruled all Keylon's issues, we affirm the trial court's judgment.

AFFIRMED.

W. SCOTT GOLEMON
Chief Justice

Submitted on December 27, 2024
Opinion Delivered April 23, 2025
Do Not Publish

Before Golemon, C.J., Wright and Chambers, JJ.